IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEFFREY HOWARD LYNCH,
          Plaintiff,

v.                                 Civil Action No. 1:10CV210
                                 (Keeley)

MICHAEL ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,
          Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's "Statement of Errors" [DE 9], Defendant's Motion for Summary Judgment [DE 10], Plaintiff's Reply [DE 12], Defendant's Surreply [DE 14], Plaintiff's Motion to Permit Further Memorandum [Docket Entry 16], and Plaintiff's Second Motion to Permit Further Memorandum [Docket Entry 18], and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Jeffrey Howard Lynch ("Plaintiff") filed applications for DIB and SSI on July 25, 2008, alleging disability beginning April 25, 2008, due to a double cerebellum stroke causing blurred vision, bad balance, vertigo, and thin blood (R. 105, 108, 137). Both applications were denied initially and on reconsideration (R. 57, 62, 68, 71). Plaintiff requested a hearing in November, 2008. Administrative Law Judge ("ALJ") Karl Alexander held a hearing on January 11, 2010 (R. 26). By decision dated April 15, 2010, the ALJ denied benefits (R. 24). The Appeals Council denied

Plaintiff's request for review October 29, 2010, and he appealed the ALJ's decision to the United States District Court of the Northern District of West Virginia.

## II. Statement of Facts

Jeffrey Howard Lynch ("Plaintiff") was born on March 11, 1970, and was 38 years old on his alleged onset date and 40 years old at the time of the ALJ's decision (R. 24). He finished eleventh grade and has been a truck driver for the past 13 years (R. 145).

On April 24, 2008, Plaintiff presented to the ER with complaints of severe headache for the last few days, with no specific radiation (R. 191). The headache became worse about 4 p.m. that day. He reported it as the worst headache he ever had, and subsequently experienced some numbness along the left corner of his mouth with lightheadedness. He was profusely sweating. He denied any weakness or numbness or any difficulty in speech, chest pain, shortness of breath or palpitation. He reported no abdominal pain, nausea, vomiting or diarrhea. He was noted to be bradycardic with a heart rate of 40-45. Upon examination, he had a questionable left sided facial droop and a questionable left 7th nerve palsy. Examination was otherwise normal. CT scan of the head revealed no acute intracranial abnormality, but possible sinusitis (R. 200). Plaintiff was diagnosed with severe headache, rule out subarachnoid hemorrhage, rule out meningitis; and hypothermia, etiology unclear.

There were no facilities to admit Plaintiff, so he was transferred to another hospital, where he was admitted (R. 215). An MRI of the brain showed a bioccipital infarct[1] (R. 215). An MRI revealed abrupt occlusion of both vertebral arteries at the C1 level with possible mild filling defect

---

[1]Areas of coagulation tissue death in both sides of the posterior of the brain due to local ischemia resulting from obstruction of circulation to those areas. Dorland's Illustrated Medical Dictionary, at 934 (32d ed. 2012).

of the basilar artery. He was admitted to the stroke unit for further monitoring and evaluation. Repeat CT's revealed persistent infarct but no worsening – no evidence of new bleeds or hydrocephalus during his hospital stay. Plaintiff underwent physical therapy, speech therapy and occupational therapy. His neurologic status remained stable. Plaintiff was 5'10" tall and weighed 234 pounds. He developed persistent hiccups, "likely secondary to his acute stroke," which were managed on multiple medications with modest improvement. Upon discharge he was accepted at a rehabilitation facility. He was instructed to use a walker at home to assist with balance and to walk with assistance otherwise. A sleep study was recommended for possible sleep apnea. He was not medically cleared to return to work.

April 25, 2008, is Plaintiff's alleged onset date.

On May 7, 2008, the rehab facility noted Plaintiff had ataxia[2] affecting both upper and lower extremities (R. 277). He was able to open his left eye with less difficulty than the day before. He reported he was sleeping and eating well and the numbness on his face was improving. He did report continuing sharp shooting pain causing headache in C2 dermatonal distribution, although diminished.

On May 8, 2008, the rehab facility reported Plaintiff's headache had improved. Plaintiff stated he would like to go home, feeling he could rest better there. He was eating well, and therapy was going well.

On May 9, the rehab facility reported Plaintiff's headache continued to improve (R. 274). He still had pain in his left neck radiating to the left temporal area. His vision was improving. He

---

[2]Failure of muscular coordination; irregularity of muscular action. Dorland's Illustrated Medical Dictionary at 170 (32d ed. 2012).

also reported decreased sleep, but had taken a four hour nap after therapy the day before. He was reported to be progressing well.

On May 10, 2008, the rehab facility noted Plaintiff had no new issues. He had a headache at a level 8 out of 10, but his vision improved daily. He was sleeping well. He got 7-8 hours sleep the night before. He was noted to be progressing well. His headache continued to improve.

On May 12, 2008, the rehabilitation facility noted that Plaintiff continued to improve, although he did report he was agitated the past weekend secondary to an argument with his girlfriend (R. 270). He required a sleeping aid and anxiety medication. Otherwise he was eating well and sleeping well. He was noted to be progressing well. Although his headaches waxed and waned they were continuing to improve.

Plaintiff was discharged from the rehab facility on May 13, 2008 (R. 279). His functional independence measures at discharge were: Eating and grooming at modified independence level; Bathing at supervision level; Dressing and toileting at modified independence level; Bladder management between modified independence and complete independence; Bowel management at modified independence; Transfer from bed, chair, wheelchair, tub and shower all at supervision level; Ambulation and stairs at supervision level and he could ambulate greater than 150 feet; Comprehension, expression, social interaction, problem solving and memory all at the modified independence level.

Plaintiff was discharged to his mother's home with Zocor, Neurontin, and Coumadin. He was also to receive outpatient physical therapy and was issued a standard walker.

Plaintiff began outpatient physical therapy on May 15, 2008 (R. 318). He reported left facial numbness, left leg weakness, right leg altered sensation, loss of coordination, poor balance, and

limited endurance. He used a cane to walk and had an apraxic gait[3] with wide stance and decreased step length. His seated balance was good. He required help for standing balance without an assistive device. He could maintain feet together position for 15 seconds with moderate sway. His primary deficits were functional mobility and balance deficits.

On May 16, Plaintiff reported no difficulty with the medication prescribed during his last visit, although he did report the treatment caused fatigue (R. 317).

On May 19, 2008, Plaintiff presented to Dr. Figel for follow up (R. 258). He had been discharged from the rehabilitation center on May 15, 2008. He was on Coumadin therapy and going through physical therapy. He had been feeling well and doing well. He complained of residual weakness of the left side of his face and some ptosis[4] of his left eyelid. He had occasional headaches. He complained of feeling very anxious and nervous. Upon examination Plaintiff did have had some drooping of the left eyelid and some mild left-sided residual weakness. Dr. Figel prescribed Xanax for his anxiety.

On May 22, Plaintiff reported increased paresthesias along the right leg and arm and left side of his face (R. 316). On May 23, he reported little sleep over the last week due to right leg paresthesias (R. 315). On May 29, he reported improvement with ambulation and ascending and descending stairs (R. 314). On May 30, he reported improvement with ambulation, but difficulty sleeping (R. 313). On June 2, 2008, he reported improvement with ambulation but continued to report altered sensation. On June 5, 2008, Plaintiff reported he hurt his neck the day before when

---

[3]A disorder of gait and equilibrium caused by a lesion in the frontal lobe . . . . the person walks with a broad-based gait, taking short steps and placing the feet flat on the ground. Dorland's Illustrated Medication Dictionary at 121 (32d ed. 12012).

[4]Prolapse or drooping of the upper eyelid. Id. at 1551.

trying to change a tire. He also reported overall fatigue (R. 311). On June 6, 2008, he reported neck pain that apparently was causing headaches and decreased sensation in his face (R. 310).

On June 10, 2008, Plaintiff followed up with Dr. Figel, his treating physician (R. 257). He still reported a feeling of numbness and tingling over the right side of his body and the left side of his face. He was having ongoing disequilibrium. He noticed some improvement since his last visit. Xanax had been helpful for the anxiety although he questioned whether he could use a little higher dose. On examination, Plaintiff had relatively equal grasp bilaterally. He had some decreased sensation to light touch over his right arm and leg and left side of his face. The diagnosis remained bilateral cerebellar CVA, Coumadin therapy, and anxiety. The doctor continued the coumadin and increased his Xanax. Plaintiff continued physical therapy.

By June 12, 2008, Plaintiff reported decreased neck pain and improved balance (R. 308). By June 23, he was reporting significant improvement with balance.

A July 3, 2008, brain scan showed old left cerebellar infarct with associated encephalomacia; nonspecific findings in the left frontal region which might represent asymmetry or perhaps minimal manifestation of previous peripheral branch infarct; and evidence of left maxillary sinusitis (R. 287).

On July 10, 2008, Plaintiff tolerated his physical therapy well (R. 300). The plan of treatment was for endurance, gait training, stability, strengthening, and balance/coordination. He stated he had steady improvement with balance but a problem site was still his upper and lower extremities.

Plaintiff applied for SSI and DIB on July 25, 2008, two months after his stroke, with an alleged onset date of April 25, 2008. (R. 105, 108). An SSA employee who conducted the initial interview of Plaintiff noted that he had difficulty with standing and walking (R. 134). His walk was described as "unsteady." Plaintiff filed a Disability Report, stating that his disability was a double

6

cerebellum stroke, and he was limited in his ability to work by resulting blurred vision, bad balance, vertigo, and thin blood (R. 137). He noted he was taking a blood thinner, anxiety medication, medication for depression (Zoloft),[5] and cholesterol medication.

Plaintiff also filed a Function Report in which he stated that when he got up he would get coffee and cereal, then sit and watch television. He would later try to take a short walk with someone, after which he came back, ate dinner, watched television, and went to bed (R. 153). He said he could no longer drive, cut grass or do laundry. The illness affected his sleep. He had to take his time dressing; he sometimes got dizzy in the bathtub and lost his balance; and took time shaving because his left side was numb. He had no problem caring for his hair or feeding himself. He did not need reminders to take medicine or take care of his grooming or personal needs. He never prepared meals because he lost his balance too much. He could not do any chores. People tried to encourage him to try things but he was "afraid of falling." He would get dizzy and had lost his balance a couple of times and fallen. He went outside daily, but had someone with him when he walked in case his fell. He grocery shopped with friends once a week, for about an hour.

Plaintiff stated that he spent time with others, visiting and talking with friends or relatives about twice a week. Plaintiff stated his condition affected a number of physical abilities, but did not check memory, concentration, understanding, following instructions, or getting along with others as problems (R. 158). He said he did not handle stress or changes in routine "good." He used a walker and a cane, which were prescribed by a doctor.

On September 22, 2008, State agency reviewing physician Cindy Osborne completed a

---

[5]A selective serotonin reuptake inhibitor ['SSRI']. Used to treat depressive, obsessive-compulsive, and panic disorders. Dorland's Illustrated Medical Dictionary at 1724 (31st ed. 2007).

Physical Residual Functional Capacity Assessment, ("RFC") opining Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday; and sit about 6 hours in an eight-hour workday (R. 320). He could never climb ladders, ropes or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, or kneel. Dr. Osborne noted Plaintiff still had some balance issues due to his stroke (R. 321). He had no manipulative, visual, communicative or environmental limitations, except to avoid all exposure to hazards (R. 323).

Dr. Osborne concluded that Plaintiff was credible and the findings supported a light RFC with limitations as indicated. He could walk two blocks and used a cane for balance as needed. She also noted his physician stated his walk was unsteady. She also quoted his daily activities, as follows:

> Watches TV, tries to take a short walk, sometimes gets dizzy in tub, doesn't need reminders, doesn't prepare meals, doesn't do any chores, visits friends and relatives, difficulty lifting, squatting, completing tasks, using hands, gets dizzy and loses his balance. Can walk 2 blocks with 10 min rest, his left eye is half shut due to loss of feeling – reason for difficulty seeing, doesn't go out alone or drive, has a cane and a walker was prescribed when he got out of hospital. Uses cane when he goes out.

(R. 324).

On September 23, 2008, State agency reviewing psychologist Bob Marinelli, Ed.D. completed a psychiatric review technique ("PRT") finding Plaintiff had an anxiety-related disorder but that it was not severe (R. 327). He would have only mild degrees of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. He had no episodes of decompensation of extended duration (R. 337).

Plaintiff's applications were denied at the initial level on October 28, 2008 (R. 164). He filed a request for reconsideration which was denied on November 6, 2008.

On December 4, 2008, Plaintiff filed his Request for Hearing by an ALJ (R. 78). In his

Disability Report for his Request for Hearing, dated November 28, 2008, Plaintiff reported that his balance and vision were worse and he got bad headaches behind his eyes (R. 179). Where asked how his condition affected his ability to function, Plaintiff stated he could not walk very well; could not tell hot from cold on his right side; and had impaired vision because his left eye "want[ed] to shut." He had new mental impairments consisting of depression and anxiety. Plaintiff stated that he had last seen Dr. Figel for treatment on November 21, 2008; however, there is no report of this visit in the record.[6]

On March 23, 2009, almost a year after his stroke, Plaintiff underwent an MRI of the head and brain (R. 363). It showed chronic[7] focal encephalomalacia[8] of the left lateral cerebellar lobe, consistent with chronic ischemic infarct,[9] with no associated focal edema, mass effect or abnormal contrast enhancement, and hypoplastic[10] vertebral and basilar artery. He had a normal angiogram of the intracranial and internal carotid circulation, but diffusely hypoplastic vertebral and basilar artery, and with absence of left superior cerebellar artery.

On March 24, 2009, Plaintiff presented to Dr. Viorica M. Crisan, M.D., an endocrinologist,

---

[6]In fact, a review of the administrative record shows it contains no medical evidence from July 2008 through March 23, 2009, when Plaintiff had the MRI. Notably, although there is a record of the MRI, there is no record of a doctor referring him for it.

[7]Chronic–persisting over a long period of time. Dorland's, Illustrated Medical Dictionary at 358 (31st ed. 2001).

[8]Softening of the brain, especially that caused by an infarct. Dorland's, supra at 621.

[9]An area of coagulation necrosis in tissue due to local ischemia resulting from obstruction of circulation to the area. Condition of the brain producing local tissue death and usually a persistent focal neurological deficit in the area of distribution of one of the cerebral arteries. Supra at 934.

[10]Incomplete development or underdevelopment of an organ or tissue; less severe in degree than aplastic. Dorland's, supra at 917.

reporting fatigue, weight gain, dizziness, and lightheadedness. He did not report anxiety, but did report poor sleep. He did not report blurry vision, but did report headaches. He had shortness of breath with wheezing. He reported no memory impairment. He had muscle weakness and gait disturbance.

Dr. Crisan diagnosed abnormal endocrine function study, impaired fasting glucose, impotence, and obesity (5'10" and 280 pounds)[11] (R. 344).

Plaintiff presented to Dr. Crisan again on April 13, 2009 for follow up (R. 345). He saw her a number of times through December 2009 for testosterone injections and testing. On December 3, 2009, she taught him to give himself testosterone injections. He was diagnosed with hypogonadism, diabetes, controlled, without complications, abnormal thyroid function, and obesity.

On May 22, 2009, Plaintiff presented to his treating psychiatrist Dr. Deol (R. 371). He had central sleep apnea. He was on Wellbutrin. He was having difficulty adjusting to his disability and he was having problems with his girlfriend. His mother lived across the street and his father was bedfast. Dr. Deol increased his Wellbutrin[12] and referred him to a therapist.[13]

On July 26, 2009, Plaintiff presented to Dr. Deol complaining of being irritable because he was not working. He said he had no desire and no motivation at all. The doctor opined Plaintiff had unrealistic expectation from medications. He was not adjusting to his disability, had financial problems, and was still having problems with balance. He could not have the recommended

---

[11]Plaintiff weighed 234 pounds when admitted to the hospital 11 months earlier.

[12]Trade name for a monocyclic compound structurally similar to amphetamine, used as an antidepressant. Dorland's supra at 265.

[13]There are no records from a therapist, although Plaintiff testified he did see a therapist named "Wendy."

neuropsychological testing because his state medical card would not pay for it.[14] Dr. Deol continued him on Wellbutrin and prescribed Paxil.[15]

On October 2, 2009, Plaintiff presented to Dr. Deol with complaints of feeling rage and feeling ready to explode (R. 373). Everyone "pissed him off." He reported that Dr. Figel had prescribed Remeron,[16] but it was not helping. Wellbutrin and Paxil were discontinued and he was started on Depakote.[17]

On November 6, 2009, Plaintiff told the psychiatrist the Depakote was helping with his temper and impulsivity. He was also trying to walk. His Depakote was increased.

On December 18, 2009, Plaintiff told his psychiatrist he had a court hearing for disability. He reported frustration and was afraid he was going to snap. He was already taking Lyrica,[18] Coumadin, testosterone, Depakote, and Klonopin.[19]

The Administrative Hearing was held on January 11, 2010 (R. 26). Plaintiff was represented by an attorney. At the outset of the hearing, the ALJ asked Plaintiff's attorney if she had any

---

[14]Again, there is no record of any health care provider, including Dr. Deol, referring Plaintiff for, or suggesting neuropsychological testing.

[15]Trade name for a selective serotonin reuptake inhibitor ["SSRI"] used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders. Dorland's, supra at 1405.

[16]Trade name for an antidepressant. Used to treat depression and major depressive disorder. Dorland's supra at 1186.

[17]Trade name for a compound used in the treatment of manic episodes associated with bipolar disorder. Dorland's supra at 565.

[18]Trade name for an anticonvulsant, antinociceptive, used in the treatment of neuropathic pain. Dorland's, supra at 1531.

[19]Trade name for a benzodiazepine used as an anticonvulsant and as an antipanic agent in the treatment of panic disorders. Dorland's supra at 379.

11

objection to the exhibits, to which counsel replied she did not. The ALJ then admitted into evidence Exhibits 1 through 4A, 1 through 11B, 1 through 7D, 1 through 11E, and 1 through 10F.

Plaintiff testified that when he first had his stroke in April 2008, his left eye was shut for ten days (R. 32). At the time of the hearing it still shut "[p]artially, and not all the way but partially it does." Plaintiff testified he had difficulty with his balance. He said he'd fallen, and that when he went to put on his shoes or socks or pants he had to hold onto something or he would lose his balance and "stumble around." He testified he had fallen a few times, not all the time, but a few times at home. That was the reason his doctor gave him the cane.

When asked if Dr. Figel was his main doctor, Plaintiff replied, "Yes . . . That's my family" (R. 33). When asked if this family doctor had told him that he could not go back to driving a truck, Plaintiff said, "Yes. He said at this time and moment, you know, that you never know how long these things could last. They could be permanent or not." He was also told he could possibly have another stroke. He also testified Dr. Figel had told him, and had written in a report in June [2009], that he didn't think Plaintiff could work full time.[20]

Plaintiff testified he felt "better but worse" since the time of his stroke. He had good days and bad days. On the bad days he got "real bad headaches," slept a lot, and could not perform. He had gained at least 50 pounds. He testified he was told to exercise in his chair, but he still had to watch his balance. He had tingling sensations in his hands. He was right handed and had no feeling in that hand. He dropped things.

Plaintiff testified that he noticed he had both short-term and long-term memory problems

---

[20]This report was not in the administrative record. It was submitted to the Court as "Missing evidence."

12

since his stroke (R. 35). He testified he had a psychiatrist (Dr. Deol), a neurologist, Dr. Malik, and his family doctor, Figel. He was also seeing an endocrinologist (Crisan). He usually saw these doctors monthly or bi-monthly. He saw the psychiatrist every two months. He drove short distances, just to the doctor and to the store down the street.

Plaintiff now lived with his mother, who worked, and his father, who was disabled and bedfast. He did not do much housework because his mother "really don't want me doing much because of my balance and stuff, and she is always at work. So if I fall, you know, nobody is there to get me, you know" (R. 39).

Plaintiff said he had to take "a shot" every Thursday, but sometimes his mother had to remind him to take it. His medications made him tired to the point that there were "times that I don't know, you know. I just get to where I'm just like nodding off, you know." He did not believe he could go back to driving a truck, and did not think he could work behind a desk because of his brain. He found himself getting frustrated. He was working with his psychiatrist on that issue because he was used to a routine.

Plaintiff had sleep apnea but his CPAP machine helped. He no longer shaved and did not keep his hair cut like he used to. He showered daily but it was hard "because of the weight gain and everything that I've got." He had no bars in the shower to hold on to. His mother had bought him a new electric razor but he was not good at using it because of his hand, because facial numbness, and because he "was always used to the regular razor." His handwriting had changed, and he had never used a computer.

Plaintiff's mother testified he didn't remember anything (R. 43). She would call him from work and tell him to take the meat out of the freezer but when she got home, he had forgotten to do

it. He lost his balance and had fallen into her a number of times while walking through the living room. He fell down the steps a couple of times. He went step by step and held on to the rail. She did not trust him going up and down steps. She testified he got depressed and slept all the time. She reminded him to take his shot. He used the cane, but not in the house. In the house he tried to hold onto things, and that is why he fell on her.

The ALJ asked the VE if there would be any work at the light exertional level for an individual with Plaintiff's education and work history who would require a sit/stand option, could perform postural movements occasionally, could not balance or climb ladders, ropes or scaffolds, should not be exposed to temperature extremes or hazards, and should do minimal fine manipulation. He would require a cane for ambulation for balance purposes and would be limited to unskilled work involving only routine and repetitive instructions and tasks (R. 47). In response, the VE testified there would be jobs available for such an individual in the state and national economic area. There would also be jobs available for the same individual at the sedentary level. None of the jobs were of an assembly line or production line pace.

Counsel then asked the VE if any jobs would be available if he added "the fact that this employee would have to miss work two to three times a month to attend doctor's appointments," to which the VE responded that if the individual missed "more than two days a month consistently" he would get fired. If the person was off task three or four times in an eight hour day for ten to twenty minutes, he also would get fired.

Counsel asked the VE if someone with a short-term memory problem which prevents him from remembering tasks in his home would be impaired in his ability to learn the tasks of operating machines. The VE replied that if a person had a memory problem, the type of jobs he had identified

would allow the person to write down the information he could look at whenever needed, but he would not be capable of working if he had to look at those instructions more than two times an hour.

At the conclusion of the hearing, the ALJ asked counsel how long she needed the record held open, to which she replied:

> The three records I thought would be helpful, Your Honor, are January 15th, February 19th, and February 22nd. So I think if you gave me forty-five days most of these physicians have been very prompt in faxing me the records.[21]

The ALJ then stated he would hold the record open for 45 days, and if anything he received changed the RFC he could convene a supplemental hearing or proceed by vocational interrogatories. They would "just have to see what arises when the new evidence comes in."

On January 15, 2010, counsel faxed to the ALJ evidence consisting of records from endocrinologist Dr. Crisan, dated from March, 2009 to December 3, 2009, and from psychiatrist Dr. Deol, from May 2009 until December 2009. This evidence is all included in the record and recited above. The fax cover sheet indicates 33 pages were faxed, and the undersigned notes 33 pages are in the record. The cover sheet also identifies the evidence, which appears to all be in the record. There is no record of any other evidence having been submitted to the agency around that time period or after.

### III. Motion to Remand for Consideration of New and Material Evidence

The ALJ entered his unfavorable decision on April 15, 2010. In his decision, the ALJ expressly notes the lack of records of any mental health treatment from June 2008 until May 2009.

---

[21]These records were to be from doctor appointments scheduled for after the hearing, in 2010. Counsel had requested extra time in her brief, specifically to obtain those three records. Yet the brief is not in the administrative record, nor are the records from the three mentioned doctor appointments.

15

The ALJ also expressly notes there were no other reports of medical treatment from July 2008, until January 2009. He states:

> Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor other than when the claimant was discharged from the hospital to the rehabilitation unit. The claimant's allegation that his primary care physician told him that he could not return to work is not supported by the medical evidence of record.

(R. 21).[22] The ALJ further finds that Plaintiff exaggerated the nature and extent of his impairments, "[g]iven the lack of an objective basis for his complaints." He also states "it is difficult to attribute that degree of limitation to the claimant's medical conditions, as opposed to other reasons, in view of the relatively weak medical evidence . . . ."

As already stated, the ALJ's decision was sent to Plaintiff and his then-counsel, Sharon Bogarad, on April 15, 2010. Plaintiff had 60 days to review the decision and the record and appeal the unfavorable decision to the Appeals Council. On May 4, 2010, in a letter signed by a paralegal, Ms. Elo, Attorney Bogarad's office wrote to SSA, advising that Plaintiff wished to appeal the decision, "however, my office has not handled a Social Security matter beyond this point and I do not feel comfortable starting with Mr. Lynch's case. I have informed him in person and in writing that I will not be representing him any further." Counsel did not request an enlargement of time to file the appeal, did not note any evidence missing from the record, and did not request permission to submit further evidence.

On May 10, 2010, Plaintiff appointed attorney Thomas Hampton to represent him (R. 7).

---

[22]The ALJ is correct that there is no such statement in the administrative transcript. As already noted, Plaintiff's current counsel submitted to the Court the record in question, from June, 2009, in which Dr. Figel does opine that Plaintiff is not capable of working any full-time job.

Attorney Hampton wrote to SSA on May 13, 2010, enclosing a request for review of hearing decision (R. 6). Counsel did not note any evidence missing from the administrative record, did not request additional time to review the decision and evidence, and did not submit any additional evidence or any argument to the Appeals Council. The Appeals Council denied review on October 29, 2010, finding no reason to overturn the ALJ's decision (R. 1).

Third (and current) counsel Timothy Cogan timely filed the Complaint in this Court on December 22, 2010. Defendant timely filed his Answer on February 14, 2011, also filing the Certified transcript, the cover page of which certifies "that the documents annexed hereto constitute a full and accurate transcript of the entire record of proceedings relating to this case." Plaintiff filed his "Statement of Errors" on March 30, 2011 (Docket Entry 9). In a footnote, counsel advises:

> Plaintiff's attorney did not handle this case at the hearing. He received a description of evidence of evidence [sic] ,e.g., physician examinations, that he cannot find in the record. Plaintiff's attorney has attached an appendix indicating evidence that previous counsel's office suggested was in the record but which current counsel cannot find.

Id. at fn. 9.

Counsel attached an "Appendix Regarding Missing Documents," stating that former counsel's office told him the evidence "would have been submitted" to SSA. Counsel notes that the records supplied by Ms. Bogarad's office "seem much fewer in number than those referenced in the brief yet previous counsel's office states that nothing was mentioned in its brief that was not submitted to Social Security." The pre-hearing brief to which counsel refers, however, is also not contained in the certified record.

The records attached to Plaintiff's Brief are as follows:

- 10/17/08     Dr. Figel

Plaintiff complains right side of body still feels funny and left side of head feels numb. He complained of bad headaches, a lot of heartburn, and trouble hearing in his left ear. Dr. Figel diagnosed CVA, disequilibrium, paresthesis, and depression.

- 11/21/08      Dr. Figel

Plaintiff complained of being very depressed. Said his lips went numb, the left side of his face was still numb, and he had shooting pain in his left ye. He was not taking any medications. Dr. Figel diagnosed CVA, disequilibrium, and depression.

- 1/16/09      Dr. Figel

Plaintiff complained his head "felt messed up today." He felt pressure in his left ear, was short of breath at times, and was having problems with erectile dysfunction. Dr. Figel diagnosed CVA, sinusitis, and ED.

- 2/19/09      Dr. Figel

Plaintiff complained of bloody noses and headache. Oxycodone did not help at all. Percocet took the edge off but did not last long. The headaches woke him up, like a sharp pain through his eyes. Dr. Figel diagnosed CVA, headaches, depression, and sinusitis.

- 3/10/09      Dr. Figel

Plaintiff complained of continuing daily headaches, not helped by Oxycodone and Percocet. He had seen psychiatrist Deol, who took him off Zoloft and put him on Lexapro. Overall, he was about the same, depressed and anxious. Fioricet had not helped his headaches. Neurological exam showed some left sided residual weakness. Dr. Figel diagnosed Bilateral Cerebellar CVA, headaches, depression, and onychomycosis.

- 4/28/09      Dr. Figel

Physical for Medicaid. Plaintiff also complained of "areas" on his right arm and toenail fungus. Dr. Figel diagnosed Cerebellar CVA, Sleep Apnea, depression, onychomycosis, and hyperlipidemia.

- 6/9/09        Dr. Figel

Plaintiff had a sleep study done which was remarkable for sleep apnea. He was attempting use of CPAP. He still complained of some intermittent headache and at times vague sensations on the right side. He had chronic dysequilibrium. He was anxious and depressed. Dr. Figel diagnosed History of Cerebellar CVA, depression, sleep apnea, tinea pedis, and positive stressors. Dr. Figel opined, (more than one year after his stroke) that Plaintiff had not regained the capacity to work at his previous job. Nor did he feel, at the time, that Plaintiff had the capacity for full-time employment.[23]

Defendant filed his Motion for Summary Judgment on April 28, 2011, specifically arguing "Remand is not required to consider Plaintiff's Appendix, new evidence, or extra-record evidence." Defendant argued that none of the evidence could be the basis for remand pursuant to sentence six of 405(g) unless it is new, material, and there is good cause for the failure to incorporate the evidence into the record in a prior hearing. As Defendant notes, however, Plaintiff did not move for remand based on new evidence to the Court.

On May 5, 2011, Plaintiff filed a Reply, "limited to the issue of remand on the basis of new and material evidence." Plaintiff also cites 42 USC section 405(g), sentence six, arguing it does

---

[23]This is the document to which counsel referred in a question to Plaintiff during the hearing. It was not, however, found in the certified record, and the ALJ specifically noted that Plaintiff testified "Dr. Figel told him in June that he could not go back to truck driving at that time. However, this testimony is not supported by Dr. Figel's records, which contain no restriction on work."

apply to this case because the evidence is new "in that it is not cumulative to the evidence in the record;" is material "in that it should cause the ALJ to re-evaluate his denial;" and that there is good cause for the evidence not being submitted to the administration. As regards the last, Plaintiff argues that prior counsel "obviously thought that the material had been submitted, for she referred to it and accurately characterized it." Further, the pre-hearing brief also did not appear in the record, and "[t]here would be no reason to prepare such a brief and not submit it." Counsel speculates that the "most likely possibility" is that the material was properly submitted but because of SSA's error, not included in the record. "The most likely inference is that SSA simply lost the material submitted."

The undersigned cannot agree with Plaintiff's argument, however, because it is simply speculation. The undersigned has read the affidavit submitted by Ms. Bogarad's paralegal, which states it is her "distinct recollection" that she submitted the evidence via fax prior to the date of the hearing "and/or" personal delivery on the date of the hearing." The reason she "distinctly recalls" the case is because "it was one of the first Social Security cases that [she] worked on." Besides having a lack of experience with Social Security cases, Ms. Elo is not sure whether she submitted the materials by fax prior to the hearing or by personal service the day of the hearing. She admittedly did not print a report from the fax machine to confirm transmission of the documents. There is no fax cover sheet. She also has a distinct recollection of drafting the Pre-Hearing memorandum and submitted it, again, "via fax prior to the date of the hearing and/or personal submission on the date of the hearing." Not only is there no confirmation for this fax, there is not a copy of a cover sheet for it (there is a cover sheet attached to the 33 pages of records faxed to SSA just after the hearing, which are all contained in the record). This was not only one of the first Social Security cases the paralegal had handled, but after the ALJ's decision attorney Bogarad admitted she had never taken

a case past the hearing stage and did not want to start with Plaintiff's case.  Upon consideration of

all which, the undersigned must find it at least as likely that the materials were never submitted (due,

possibly to failure of the faxes to go through), as it is that SSA simply "lost" the documents.

> A reviewing court may remand a Social Security case to the Secretary on the basis
> of newly discovered evidence if four prerequisites are met. The evidence must be
> "relevant to the determination of disability at the time the application was first filed
> and not merely cumulative." *Mitchell v. Schweiker,* 699 F.2d 185, 188 (4th Cir.1983).
> It must be material to the extent that the Secretary's decision "might reasonably have
> been different" had the new evidence been before her. *King v. Califano,* 599 F.2d
> 597, 599 (4th Cir.1979); *Sims v. Harris,* 631 F.2d 26, 28 (4th Cir.1980). There must
> be good cause for the claimant's failure to submit the evidence when the claim was
> before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the
> remanding court "at least a general showing of the nature" of the new evidence. *King,*
> 599 F.2d at 599.

Borders v. Heckler, 777 F.2d 954 (4th Cir. 1985).  The undersigned finds Plaintiff has met all the

prerequisites for remand except for the requirement that there be good cause for his failure to submit

the evidence when the claim was before the secretary.  The evidence is clearly relevant to the

determination of disability at the time his application was first filed and is not cumulative of other

evidence in the record.  The evidence is also material, in that the ALJ specifically based his decision

in large part on the lack of medical records and especially on Plaintiff's testimony that his doctor had

told him he could not work, while finding no such opinion in the record. Counsel submitted the

actual records to the Court, thus meeting the last prerequisite, that he present at least a general

showing of the nature of the new evidence.

The undersigned cannot find, however, that there was good cause for the failure to submit

the evidence at the administrative level, as required by Borders.  As previously noted, the

Administrative Hearing was held on January 11, 2010. The ALJ specifically asked prior counsel if

she had any objections to the exhibits, to which counsel replied she did not.  Counsel requested 45

additional days at the end of the hearing to obtain further records, but these were not "missing" records; instead, they were records for future doctor visits. When the ALJ's decision was entered in April 2010, it would have been evident to any reviewer who knew the evidence in the case, that much evidence must have been missing from the record. While Plaintiff argues the ALJ should have known there was a record from Dr. Figel from June 2009, because counsel questioned Plaintiff about it, counsel herself should have noticed that the decision expressly stated there was no such document in evidence. Counsel had 60 days from entry of that decision to advise the ALJ or the Appeals Council that evidence was missing from the record. Neither Ms. Bogarad nor Mr. Hampton did so, however. No additional evidence was submitted. The Appeals Council decision came out in October, 2010, finding no reason to reverse the ALJ's decision.

The undersigned therefore finds Plaintiff has not shown good cause for the failure to submit the evidence at the administrative level

Upon consideration of all which, the undersigned United States Magistrate Judge recommends Plaintiff's Motion to Remand Because of New and Material Evidence as contained in his Reply [Docket Entry 12] be denied.

On August 25, 2011, Plaintiff filed his "Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" [Docket Entry 16]. The evidence attached to this motion consists of records of psychiatrist Deol from January, February, and April 2009, at least a full year before the ALJ's decision. Notably, these were submitted to the Court a full eight months after the Complaint was filed. Counsel explains that Dr. Deol's records were incomplete at the administrative level "most likely because of Dr. Deol's failure to transmit them to previous counsel. It is unreasonable to

assume that the previous counsel had these records yet did not submit them."

For the same reasons as stated regarding the Motion to Remand, the undersigned United States Magistrate Judge recommends Plaintiff's "Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" [Docket Entry 16] also be denied.

Finally, on September 8, 2011, Plaintiff filed "Claimant's Second Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" [Docket Entry 18]. Attached to this Motion were records of a visit by Plaintiff to neurologist Malik in November 2009, just two months before the Administrative Hearing. Present counsel obtained these records in relation to a subsequent claim he is pursuing for Plaintiff. He had asked the two doctors to complete forms, which they declined to do, instead sending records. Counsel argues that this "suggest[s] that Drs Deol and Malik did not respond to any request from previous counsel that they send complete records." Once again, counsel's argument is entirely based on speculation. Even if it were not, the undersigned would decline to remand the case to the ALJ for evidence that was in existence in 2009, but not submitted until eight months after the Court began considering the Complaint.

The undersigned therefore recommends "Claimant's Second Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" [Docket Entry 18] also be denied.

## IV. Motion for Summary Judgment
## A. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Alexander made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since April 25, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairment: status post bilateral cerebellar cerebrovascular accident with sensation, gait and balance residuals (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)with certain modifications. He requires a sit/stand option; can perform occasional postural movements except that he can perform no balancing or climbing of ladders, ropes and scaffolds; must have no exposure to temperature extremes of hot and cold, including items that are handled; must not be exposed to workplace hazards such as dangerous moving machinery or unprotected heights; should preform work that requires mostly gross manipulation and only minimal fine manipulation; must be allowed to ambulate with a cane for balance purposes; and is limited to unskilled work involving routine and repetitive instructions and tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 11, 1970 and was 38 years old, which is defined as younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

24

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from April 25, 2008, through the date of this decision(20 CFR 404.1520(g) and 416.920(g)).

(R. 12-24).

## B.  Discussion
### 1.  Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an

improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## 2. Contentions of the Parties

The Plaintiff contends:

1. The denial relied upon only a part of the RFC and PRT which were Inconsistent with the Rest of the Opinion.
2. The Denial lacks substantial evidence to support the credibility finding and crucially relies upon speculation.

The Commissioner contends:

1. The ALJ reasonably relied upon the State Agency physicians' assessments.

2. The ALJ reasonably found Plaintiff's testimony not credible.

## 3. State Agency Physician Opinions

Plaintiff first argues that the ALJ relied upon only a part of the State agency Physicians' RFC's and and psychologists' PRT's. Defendant contends the ALJ reasonably relied upon the State agency physicians' assessments.

Plaintiff suffered his stroke on April 24, 2008. On September 22, 2008, five months later, State agency reviewing physician Cindy Osborne completed a Physical Residual Functional Capacity Assessment, ("RFC") opining Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday; and sit about 6 hours in an eight-hour workday (R. 320). He could never climb ladders, ropes or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, or kneel. Dr. Osborne noted Plaintiff still had some balance issues due to his stroke (R. 321). He had no manipulative, visual, communicative or environmental limitations,

except to avoid all exposure to hazards (R. 323).

Dr. Osborne concluded that Plaintiff was credible and the findings supported a light RFC with limitations as indicated. He could walk two blocks and used a cane for balance as needed. She also noted his physician stated his walk was unsteady. She also quoted his daily activities, as follows:

> Watches TV, tries to take a short walk, sometimes gets dizzy in tub, doesn't need reminders, doesn't prepare meals, doesn't do any chores, visits friends and relatives, difficulty lifting, squatting, completing tasks, using hands, gets dizzy and loses his balance. Can walk 2 blocks with 10 min rest, his left eye is half shut due to loss of feeling – reason for difficulty seeing, doesn't go out alone or drive, has a cane and a walker was prescribed when he got out of hospital. Uses cane when he goes out.

(R. 324).

On September 23, 2008, also five months after Plaintiff's stroke, State agency reviewing psychologist Bob Marinelli, Ed.D. completed a psychiatric review technique ("PRT") finding Plaintiff had an anxiety-related disorder but that it was not severe (R. 327). He would have only mild degrees of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. He had no episodes of decompensation of extended duration (R. 337).

20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Social Security Ruling ("SSR") 96-6 provides:

27

[T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency . . . .

(emphasis added).

Regarding the ALJ's Physical Residual Functional Capacity assessment ("RFC"), the undersigned finds, contrary to counsel's argument, that the ALJ did not ignore the State agency reviewing physician's opinion that Plaintiff must avoid hazards. In fact, he found that the plaintiff must avoid workplace hazards. The undersigned finds, however, that substantial evidence does not support the ALJ's reliance on the State agency reviewer's opinion, because, through no fault of her own, she does not address Plaintiff's medically-diagnosed obesity. Plaintiff is 5'10". At the time of his stroke, he weighed 234 pounds. The State agency physician opinion was submitted about five months later and does not include obesity as even a secondary or "other" diagnosis. Plaintiff testified, and the record clearly shows that Plaintiff had gained approximately 50 pounds by the time he was examined by his endocrinologist 11 months after his stroke. At that time he weighed 280 pounds and was diagnosed by the endocrinologist with obesity. He continued to be diagnosed with obesity. He also testified as to the problems his weight gain had caused.

SSR 02-1p, for the evaluation of obesity, provides, in pertinent part:

We will consider obesity in determining whether:

The individual has a medically determinable impairment.

The individual's impairment(s) is severe.

The individuals' impairment(s) meets or equals the requirements of a listed

28

impairment in the listings.

> The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant number sin the national economy.

The Ruling further states that in the absence of evidence to the contrary in the case record, the administration will accept a diagnosis of obesity given by a treating source or by a consultative examiner. Here there is a diagnosis of obesity by a treating physician, and no evidence to the contrary in the record.

The Ruling further provides:

> As with any other medical condition, we will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual' physical or mental ability to do basic work activities. We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning . . . . Therefore we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities . . . .

The ALJ is also required to consider obesity at the third step of the sequential evaluation, when determining if any impairment(s), alone or in combination, meet a listing; and at steps four and five, when assessing functioning. The Ruling provides:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling . . . .
>
> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movements and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p . . . . our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, 5 days a week, or an equivalent work schedule . . . .

As with any other impairment, we will explain how we reached our conclusion on whether obesity caused any physical or mental limitations.

State agency physicians can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency . . . . The State agency physician in this case was unaware of the diagnosis of obesity because Plaintiff undeniably gained a great deal of weight after his stroke, and the diagnosis was made six months after the State agency physician's RFC assessment.

Here the ALJ did not mention obesity. He did not consider it when determining Plaintiff's medically determinable or severe impairments or his RFC. The ALJ cannot rely on the State agency physician's RFC because she did not consider obesity in forming the RFC.

The undersigned therefore finds substantial evidence does not support the ALJ's determination of Plaintiff's medically determinable and severe impairments; whether those impairments, alone or in combination met or equaled a listing; Plaintiff's RFC; and therefore his ultimate conclusion that Plaintiff was not under a disability from April 2008 until the date of his decision.

Regarding the plaintiff's alleged mental impairments, the ALJ found Plaintiff alleged disability due to anxiety and depression, but stated that he had only received limited mental health treatment and had no history of anxiety and depression prior to his stroke. He noted Plaintiff's primary care physician prescribed Xanax for Plaintiff's reported anxiety and nervousness shortly after his stroke, and that a month later he increased the dosage. The ALJ continues:

> The record contains no other reports of mental health treatment until May 22, 2009, when the claimant told a psychiatrist that he was "having difficulty adjusting to

disability." The claimant's medication was increased and he was referred for therapy, although the record contains no reports of therapy sessions. On July 26, 2009, the psychiatrist reported that the claimant had an unrealistic expectation from his medications. He noted that the claimant had no income at all and was having financial problems. The claimant's medications were changed. On October 2, 2009, the claimant reported rage and the Paxil and Wellbutrin were discontinued. The claimant reported on November 6, 2009, that his new medication Depakote was helping with his temper and impulsivity. On December 18, 2009, the psychiatrist reported that the claimant had a court hearing for disability but expressed no opinion as to whether the claimant was disabled or had any work-related limitations due to his anxiety. The record contains no further reports of mental health treatment.

The ALJ then finds the record does not "establish the presence of a severe psychological impairment for any continuous 12 month period," and that "[c]onsistent with the assessments submitted by the state agency psychological consultants, the claimant's anxiety had been evaluated under Section 12.06 of the Appendix1, dealing with anxiety-related disorders." The ALJ opined Plaintiff would have only mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence and pace. He had no episodes of decompensation. The ALJ further explained:

> In so finding, significant weight is given to the psychiatric review technique form ("PRTF") assessments on September 23, 2008, and November 3, 2008, which also found the above limitations. The PRTF assessments are given significant weight because they are well reasoned and fully supported by the longitudinal medical evidence of record as discussed in the consultant's notes. Furthermore, the PRTF assessments are given by mental health specialists who have an understanding of the disability programs and their evidentiary requirements.

As did the State agency physician, the State agency psychologist only had records from April 2008, when Plaintiff suffered his stroke, until September 23, 2008, only five months later. The hearing in this case was not held for another year and a half. The ALJ himself notes the reports of mental health treatment contained in the record begin May 22, 2009, when it appeared from the record that Plaintiff had first begun seeing a psychiatrist. The State agency reviewing psychologist

therefore had virtually none of the mental health records in this case to review.

In his application filed in July 2008, Plaintiff reported taking not only an anxiety medication, but also Sertraline, the generic form of Zoloft, a medication for depression. In his request for hearing in December 2008, Plaintiff claimed he had new mental limitations since he last completed a disability report, consisting of depression and anxiety. Plaintiff stated that he had last seen Dr. Figel for treatment on November 21, 2008; however, there is no report of this visit in the record.[24], [25] Even without the missing documents, however, the undersigned finds the ALJ's reliance on the State agency psychologists' opinion misplaced. The psychologist, and based on his report, the ALJ, find that Plaintiff's sole mental impairment is anxiety, and that the anxiety is not severe. It is clear, even from the record before the ALJ, however, that Plaintiff had at least a medically-determinable impairment of depression. He was being treated for depression as far back as his application in September 2008. A hospital record in June 2008, shows Dr. Figel prescribed Xanax, but by July 2008, he also prescribed Zoloft. Even if, as the ALJ finds, Plaintiff did not see a psychiatrist until May 2009, endocrinologist Crisan reported Plaintiff had a diagnosis of depression and was prescribed anti-depressant medications in March, April, and June 2009, then Depakote starting in October 2009.

Of record, and noted by the ALJ, are the reports of Plaintiff's visits with psychiatrist Deol, beginning with May 2009, in which the treating psychiatrist noted Plaintiff was already on

---

[24]One of the documents supplied to the Court, described as "missing" from the administrative transcript, is an October 2008 record of a visit with Dr. Figel, in which Plaintiff was diagnosed with depression.

[25]This record is also supplied to the Court and described as "missing" from the transcript. In it Plaintiff reports being "very depressed," and again was diagnosed with depression. He was diagnosed with, and treated for depression by Dr. Figel also on February 19, 2009, March 10, 2009, April 28, 2009, and June 9, 2009.

Wellbutrin and increased his dosage. He also referred him to a therapist, identified as "Wendy." Dr. Deol noted Plaintiff was having trouble "adjusting to disability."

In July 2009, Dr. Deol continued Plaintiff on the increased dosage of Wellbutrin and added Paxil, another antidepressant. He found, as the ALJ stated, that Plaintiff had an "unrealistic expectation from meds." In October 2009, Dr. Deol noted that "the Remeron," yet another antidepressant, prescribed by treating physician Figel, was not working. He discontinued Wellbutrin and Paxil, and started Plaintiff on Depakote. In November 2009, Plaintiff did say the Depakote was helping with his temper and impulsivity, and Dr. Deol increased the dosage. In December 2009, only weeks before the hearing, Plaintiff told Dr. Deol he was afraid he was going to "snap." The treating psychiatrist continued his Depakote and added Klonopin, yet another antidepressant. Plaintiff's mother also testified at the hearing that Plaintiff got depressed and slept all the time. Finally, SSR 00-1p, regarding the effect of obesity, expressly states: "Obesity may also cause or contribute to mental impairments such as depression."

Even if only considering the evidence contained in the administrative transcript, the undersigned does not find substantial evidence supports the ALJ's reliance on the State agency psychologists' opinion, provided long before most of the evidence regarding Plaintiff's mental impairments was even in existence. The undersigned therefore further finds substantial evidence does not support the ALJ's determination that Plaintiff's only mental impairment was anxiety, or that Plaintiff had no severe mental impairment.

### 4. Credibility

Plaintiff next argues that ALJ's denial lacks substantial evidence to support the credibility finding and crucially relies upon speculation. Defendant argues the ALJ reasonably found Plaintiff's

testimony not credible due to contradictions between Plaintiff's earlier statements and evidence and his later testimony. Further, the ALJ reasonably considered Plaintiff's daily activities, including the possibility he was caring for his father, his trying to change a tire, his regular daily activities including driving, showering, and taking short walks, his lack of medical treatment, and the motivation of secondary gain.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges []he suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20

C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ here found that Plaintiff's "medically determinable impairments" could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment. The ALJ found Plaintiff had the medically determinable impairments of post bilateral cerebellar cerebrovascular accident with sensation, gait and balance residuals, sleep apnea, diabetes, enlarged heart, and anxiety. As already noted, substantial evidence does not support the ALJ's finding at Step two that did not include consideration of obesity and depression as at least medically-determinable impairments. The undersigned again notes that the administration states that obesity may also cause or contribute to other physical impairments or mental impairments such as depression. The undersigned therefore finds the ALJ did not take into account "all the available evidence," and substantial evidence does not therefore support his finding that neither Plaintiff nor his mother were entirely credible.

## V. RECOMMENDATION

For the reasons above stated, the undersigned finds that substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and SSI, and accordingly **RECOMMENDS** that Defendant's Motion for Summary Judgment [Docket Entry 10] be **DENIED**; Plaintiff's Motion for Summary Judgment [Docket Entry 9–entitled "Plaintiff's Statement of Errors"] be **GRANTED in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation; Plaintiff's Motion to Permit

Further Memorandum [Docket Entry 16] be **DENIED**; Plaintiff's Second Motion to Permit Further Memorandum [Docket Entry 18] be **DENIED**; and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) calendar days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91(4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _31_ day of October, 2011.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE