IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEFFREY HOWARD LYNCH,

   Plaintiff,

v.         CIVIL ACTION NO. 1:10CV210
           (Judge Keeley)

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

   Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

On December 22, 2010, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On October 31, 2011, Magistrate Judge Kaull filed his Report and Recommendation ("R&R") (Dkt. No. 1), in which he recommended that the Court remand this case for further proceedings. He also directed the parties, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 6(e), to file any written objections with the Clerk of Court within fourteen (14) days after being served with a copy of the R&R. On November 14, 2011, the Commissioner filed objections to the R&R (dkt. no. 21). Also, on November 14, 2011, the plaintiff, Jeffrey Howard Lynch ("Lynch"), through his attorney, Timothy F. Cogan ("Cogan"), filed his

response to the Commissioner's objections, as well as his own objections to the R&R (Dkt. No. 22).

## I.  PROCEDURAL BACKGROUND

On July 14, 2008, Lynch filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability beginning April 25, 2008, due to a double cerebellum stroke that resulted in blurred vision, bad balance, vertigo, and thin blood. (Tr. 105, 108, 137). On September 23, 2008, the Commissioner denied both applications initially, and on November 7, 2008 denied both applications on reconsideration (Tr. 57, 62, 68, 71). After Lynch requested a hearing, an Administrative Law Judge ("ALJ") conducted a hearing on January 11, 2010, at which Lynch appeared with counsel and testified. (Tr. 26).

On April 15, 2010, the ALJ determined that Lynch was not disabled (Tr. 24). On October 29, 2010, the Appeals Council denied Lynch's request for review (Tr. 1). On December 22, 2010, Lynch timely filed this action seeking review of the final decision. (Dkt. No. 1).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

## II.   <u>PLAINTIFF'S BACKGROUND</u>

On April 25, 2008, the alleged disability onset date, Lynch was 38 years old, and 48 years old at the time of the ALJ's decision. (Tr. 24). He has an eleventh grade education and can communicate in English. His employment history includes work as a truck driver for 13 years. (Tr. 145).

## III.   <u>ADMINISTRATIVE FINDINGS</u>

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.   Lynch met the insured status requirements of the Social Security Act through December 31, 2013;

2.   Lynch has not engaged in substantial gainful activity since April 25, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*);

3.   Lynch has the following severe impairments: status post bilateral cerebellar cerebrovascular accident with sensation, gait and balance residuals (20 CFR 404.1520(c) and 416.920(c)) that, alone or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

4.   Lynch retains the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with certain

3

> modifications that include: a sit/stand option, no balancing or climbing of ladders, ropes and scaffolds, no exposure to temperature extremes of hot and cold, including items that are handled, no exposure to workplace hazards such as dangerous moving machinery or unprotected heights, should perform work that requires mostly gross manipulation and only minimal fine manipulation, be permitted to ambulate with a cane for balance purposes, and is limited to unskilled work involving routine and repetitive instructions and tasks;

5.   Lynch is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

6.   Lynch was born on March 11, 1970 and was 38 years old on the alleged disability onset date and is considered to be a younger individual, (20 CFR 404.1563 and 416.963);

7.   Lynch has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964);

8.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Lynch is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

9.   Considering Lynch's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)); and

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

      10.    Lynch has not been under a disability, as
               defined in the Social Security Act, from April
               25, 2008, through the date of this decision(20
               CFR 404.1520(g) and 416.920(g)).

(Tr. 12-24).

## IV.  COMMISSIONER'S OBJECTIONS

In his objections to the magistrate judge's recommendation to remand the case, the Commissioner contends that the ALJ adequately considered all of Lynch's impairments prior to determining that his impairments failed to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Relying on <u>Ngarurih v. Ashcroft</u>, 371 F.3d 182, 190 n.8 (4th Cir. 2004), he argues that remanding this matter is unnecessary because the ALJ's failure to characterize Lynch's obesity and depression as severe impairments at step two constitutes "harmless error" that would not impact the ALJ's ultimate decision.

The Commissioner also contends that Lynch did not allege a disability due to obesity in his applications for DIB and SSI, or at the hearing, or in his subsequent pleadings. He asserts that the magistrate judge unilaterally found a diagnosis of obesity on which he based his recommendation to remand this case. He further argues that the record contains no evidence that Lynch's obesity resulted

in any functional limitations that were not already included in the ALJ's residual functional capacity assessment.

Finally, relying again on harmless error, the Commissioner contends that inclusion of a non-severe mental impairment at step two of the sequential analysis would not have altered the ALJ's ultimate conclusion that Lynch was not disabled. See Lee v. Sullivan, 945 F.2d 687, 693-94 (4th Cir. 1991).

## V. PLAINTIFF'S OBJECTIONS

Lynch contends that the relevant medical evidence in the record is incomplete and "at points just plain wrong." He also alleges that the ALJ erred by failing to consider additional medical records pertaining to his documented diagnoses of obesity and depression. Finally, he contends that, in his credibility analysis, the ALJ erred by speculating about whether secondary gain was a motivating factor for Lynch. He also argues that the magistrate judge failed to find that the ALJ violated Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006), citing *Social Security Ruling* (SSR) 90-1p. (Dkt. No. 22 at 2).

## VI.  RELEVANT MEDICAL EVIDENCE

1.   An April 24, 2008 emergency department report from Saint Joseph Regional Medical Center ("SJRMC"), indicating that Lynch had

complained of a severe headache for the last few days, with no specific radiation, that the headache had worsened around 4 P.M. that day, and that two to three hours prior to coming to the ER he had experienced some numbness along the left corner of his mouth, had become lightheaded and had begun sweating profusely. He denied any weakness or numbness over his extremities, any difficulty in speech, chest pain, shortness of breath or palpitation, abdominal pain, nausea, vomiting or diarrhea.  He was noted to be bradycardic with a heart rate of 40-45.

Examination revealed a 38-year old male, 5'10" weight of 234 pounds, in acute headache distress and diaphoretic, a blood pressure of 152/82, pulse 42, respirations 16, questionable left sided facial droop, questionable left 7th nerve palsy, hypothermia etiology unclear at present time, and otherwise normal. The diagnosis was severe headache with a plan to rule out subarachnoid hemorrhage  and meningitis. The doctor transferred Lynch to another hospital, where he was admitted (Tr. 191 - 199);

2.    An April 24, 2008 CT scan from SJRMC of the head, revealing no acute intracranial abnormality, but possible sinusitis (Tr. 200);

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

3.    A May 4, 2008 discharge summary from Memorial Hospital of South Bend ("MHSB"), indicating that Lynch reported a five day history of a worsening headache, dizziness, double vision, and difficulty with balance. Physical examination revealed that Lynch's heart rate was sinus bradycardia with a rate of 55, a blood pressure of 132/88, pinpoint pupils, decreased sensation to the left side of his face with mild ptosis, a left sided face drop, poor finger-to-nose and rapid alternating movements, ataxic gait with a predisposition to fall to the left (Tr. 215).

On admission, an MRI of the brain revealed a bioccipital infarct[1] (Tr. 215), and abrupt occlusion of both vertebral arteries at the C1 level with possible mild filling defect of the basilar artery.  Lynch was admitted to the stroke unit for further monitoring and evaluation.  Repeat CT scans during his hospitalization established persistent infarct but no worsening and no evidence of new bleeds or hydrocephalus.  Lynch underwent physical therapy, speech therapy and occupational therapy.  His neurologic status remained stable.  He developed persistent

---

[1] Areas of coagulation tissue death in both sides of the posterior of the brain due to local ischemia resulting from obstruction of circulation to those areas. Dorland's Illustrated Medical Dictionary, at 934 (32d ed. 2012).

hiccups, "likely secondary to his acute stroke," which multiple medications modestly improved.

He was discharged to a rehabilitation facility with instructions to use a walker at home to assist with balance and to walk with assistance otherwise. A sleep study was recommended for possible sleep apnea. He was not medically cleared to return to work (Tr. 215-216);

4.    A May 7, 2008 report from Trinty Health System ("TMS"), a rehabilitation facility, noting ataxia[2] that affected both upper and lower extremities (Tr. 277). Lynch was able to open his left eye with less difficulty than he had the day before. He reported he was sleeping and eating well and the numbness on his face was improving. He reported continuing sharp, shooting pain causing headache in C2 dermatonal distribution, although diminished. Examination indicted a 38 year old male with a pulse of 109, respiration of 20 and a blood pressure of 144/78. Lynch was to continue stroke rehabilitation program for bilateral cerebellar cerebrovascular accident (Tr. 277);

5.    A May 8, 2008 report from TMH, reporting that Lynch's headache had improved. He stated he would like to go home, feeling

_____

[2] Failure of muscular coordination; irregularity of muscular action. Dorland's, supra at 170.

9

he could rest better there. He was eating well, and therapy was going well. Physical examination revealed a pulse of 78, respirations of 20, a blood pressure of 132/84 and a saturation rate of 97% (Tr. 275);

6.    A May 9, 2008 report from TMH, indicating that Lynch's headache continued to improve (Tr. 274). He still had pain in his left neck, radiating to the left temporal area. His vision was improving. He also reported decreased sleep, but had taken a four hour nap after therapy the day before. He was reported to be progressing well. Physical examination revealed a pulse of 80, respirations 20, a blood pressure of 140/86 and a saturation rate of 97% on room air (Tr. 274);

7.    A May 10, 2008 report from TMH, indicating Lynch had no new issues. He had a headache at a level 8 out of 10, but his vision improved daily. He was sleeping well and had gotten 7-8 hours sleep the night before. He was noted to be progressing well. His headache continued to improve. Physical examination revealed pulse of 96, respirations 20, a blood pressure of 137/77 and a saturation rate of 96% on room air (Tr. 272);

8.    A May 12, 2008 report from TMH, indicating that Lynch continued to improve, although he did report he was agitated the

past weekend secondary to an argument with his girlfriend (Tr. 270). He required a sleeping aid and anxiety medication. Otherwise, he was eating well and sleeping well. He also was noted to be progressing well. Although his headaches waxed and waned, they were continuing to improve. Physical examination revealed pulse 85, respirations 20, a blood pressure of 132/81 and a saturation rate of 98% on room air (Tr. 270);

9. A May 13, 2008 discharge summary from TMH, indicating that Lynch was eating and grooming at modified independence level, bathing at supervision level, dressing and toileting at modified independence level, bladder management between modified independence and complete independence, bowel management at modified independence, transfer from bed, chair, wheelchair, tub and shower all at supervision level, ambulation and stairs at supervision level and he could ambulate greater than 150 feet, comprehension, expression, social interaction, problem solving and memory all at the modified independence level. Lynch was discharged to his mothers's home. His medications were Neurontin and Coumadin. He was also to receive outpatient physical therapy and was issued a standard walker (Tr. 279-80);

10.  A May 15, 2008 report from Summit Physical Therapy, Inc. Weirton ("SPTIW"), indicating left facial numbness, left leg weakness, right leg altered sensation, loss of coordination, poor balance, and limited endurance.  He used a cane to walk and had an apraxic gait[3] with wide stance and decreased step length.  His seated balance was good. He required help with balance if he stood without using an assistive device.  He could maintain feet together position for 15 seconds with moderate sway.  His primary deficits were in the areas of functional mobility and balance. (Tr. 318);

11.  A May 16, 2008 report from SPTIW, indicating no difficulty with the medication prescribed during his last visit, although he did report the treatment caused fatigue (Tr. 317);

12.  A May 19, 2008 report from Riverside Medical of Ohio ("RMO"), indicating that John N. Figel, M.D., saw Lynch for a follow up appointment following his discharge from the rehabilitation center on May 15, 2008. He was on Coumadin therapy and going through physical therapy. He had been feeling well and doing well. He complained of  residual weakness of the left side of

---

[3] A disorder of gait and equilibrium caused by a lesion in the frontal lobe . . . . the person walks with a broad-based gait, taking short steps and placing the feet flat on the ground. Dorland's, supra at 121.

his face and some ptosis[4] of his left eyelid. He had occasional headaches. He complained of feeling very anxious and nervous. Examination revealed a weight of 243, a blood pressure of 120/88, a pulse of 72, respiration rate of 15, no clubbing, cyanosis or edema of the extremities, some drooping of the left eyelid and some mild left-sided residual weakness. Dr. Figel prescribed Xanax for his anxiety (Tr. 258);

13. A May 22, 2008 report from SPTIW, indicating increased paresthesias along the right leg and arm and left side of his face (Tr. 316);

14. A May 23, 2008 report from SPTIW, indicating Lynch reported having had little sleep over the last week due to right leg paresthesias (Tr. 315);

15. A May 29, 2008 report from SPTIW, indicating Lynch reported improvement with ambulation and ascending and descending stairs (Tr. 314);

16. A May 30, 2008 report from SPTIW, indicating Lynch reported improvement with ambulation, but difficulty sleeping (Tr. 313);

---

[4] Prolapse or drooping of the upper eyelid. Dorland's, supra at 1551.

17. A June 2, 2008 report from SPTIW, indicating Lynch reported improvement with ambulation but continued altered sensation (Tr. 313);

18. A June 5, 2008 report from SPTIW, indicating Lynch reported overall fatigue and having hurt his neck the day before while trying to change a tire (Tr. 311);

19. A June 6, 2008 report from SPTIW, indicating Lynch reported neck pain that apparently was causing headaches and decreased sensation in his face (Tr. 310);

20. A June 10, 2008 report from Dr. Figel, Lynch's treating physician, indicating that Lynch reported a feeling of numbness and tingling over the right side of his body and the left side of his face, as well as ongoing disequilibrium with some improvement since his last visit. Lynch reported that Xanax had been helpful for his anxiety, although he questioned whether he could use a little higher dose. Examination revealed a weight of 246, a blood pressure of 125/76, a pulse of 74, respirations of 18, a relatively equal grasp bilaterally, and some decreased sensation to light touch over his right arm and leg and left side of his face. The diagnosis remained bilateral cerebellar CVA, Coumadin therapy and anxiety.

Dr. Figel continued the Coumadin, increased his Xanax, and continued physical therapy (Tr. 257);

21.  A June 12, 2008 report from SPTIW, indicating that Lynch reported decreased neck pain and improved balance with the problem site being his upper and lower extremities (Tr. 308);

22.  A June 23, 2008 report from SPTIW, indicting significant improvement in Lynch's balance but his upper and lower extremities remained a problem site (Tr. 305);

23.  A July 3, 2008 brain scan without contrast, indicating an old left cerebellar infarct with associated encephalomacia, nonspecific findings in the left frontal region which might represent asymmetry or perhaps minimal manifestation of previous peripheral branch infarct, and evidence of left maxillary sinusitis (Tr. 287);

24.  A July 10, 2008 report from SPTIW, indicating that Lynch tolerated his physical therapy well. The plan of treatment was for endurance, gait training, stability, strengthening, and balance/coordination.  He stated he had steady improvement with balance, but his upper and lower extremities remained a problem site (Tr. 300);

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

25. A July 25, 2008 Application Summary for Supplemental Security Income indicating that the SSA employee who conducted the initial interview noted that Lynch had difficulty with standing and walking and described his walk as "unsteady" (Tr. 134);

26. A September 22, 2008 Physical Residual Functional Capacity Assessment ("RFC"), from Cindy Osborne, a State agency reviewing physician, indicating that Lynch could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an eight-hour workday, could never climb ladders, ropes or scaffolds, could only occasionally climb ramps and stairs, balance, stoop, or kneel, had no manipulative, visual, communicative or environmental limitations, except to avoid all exposure to hazards. Dr. Osborne noted Lynch still had some balance issues due to his stroke (Tr. 319-24).

Dr. Osborne concluded that Lynch was credible and that the findings supported a light RFC with limitations as indicated (Tr. 324). He could walk two blocks and used a cane for balance as needed. She also noted that his physician stated his walk was unsteady. She listed his daily activities as:

> Watches TV, tries to take a short walk, sometimes gets dizzy in tub, doesn't need reminders, doesn't prepare

meals, doesn't do any chores, visits friends and
relatives, difficulty lifting, squatting, completing
tasks, using hands, gets dizzy and loses his balance.
Can walk 2 blocks with 10 min rest, his left eye is half
shut due to loss of feeling – reason for difficulty
seeing, doesn't go out alone or drive, has a cane and a
walker was prescribed when he got out of hospital. Uses
cane when he goes out.

(Tr. 324).

26. A September 23, 2008 psychiatric review technique ("PRT")
from Bob Marinelli, Ed.D., a state agency reviewing psychologist,
indicating that Lynch had an anxiety-related disorder that was not
severe. Lynch had only a mild degree of limitation in activities of
daily living, maintaining social functioning, maintaining
concentration, and persistence, or pace, and has had no episodes of
decompensation of extended duration (Tr. 327-37). Marinelli noted
Lynch's medication as Alprazolam for anxiety and Sertraline for
depression and further noted that Lynch was not receiving any
psychiatric treatment. Lynch reported that he "did not have
problems with anxiety and depression before his physical problems
started." Marinelli stated Lynch appeared credible (Tr. 339).

27.  A March 23, 2009 MRI report of the head and brain from Trinity West, indicating chronic[5] focal encephalomalacia[6] of the left lateral cerebellar lobe, consistent with chronic ischemic infarct,[7] with no associated focal edema, mass effect or abnormal contrast enhancement, and hypoplastic[8] vertebral and basilar artery.  He had a normal angiogram of the intracranial and internal carotid circulation, but diffusely hypoplastic vertebral and basilar artery, and with absence of left superior cerebellar artery. The impression noted normal angiogram of the intracranial and internal carotid circulation and diffusely hypoplastic vertebral and basilar artery absence of left superior cerebellar artery (Tr. 363);

---

[5] Chronic—persisting over a long period of time.  Dorland's, supra at 358.

[6] Softening of the brain, especially that caused by an infarct.  Dorland's, supra at 621.

[7] An area of coagulation necrosis in tissue due to local ischemia resulting from obstruction of circulation to the area. Condition of the brain producing local tissue death and usually a persistent focal neurological deficit in the area of distribution of one of the cerebral arteries. Dorland's, supra at 934.

[8] Incomplete development or underdevelopment of an organ or tissue; less severe in degree than aplastic.  Dorland's, supra at 917.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

28.  A March 24, 2009 report from Viorica M. Crisan, M.D., an endocrinologist at The Endocrinology Clinic, indicating an evaluation of abnormal testosterone levels. Lynch reported a history of a cerebellar stroke in April 2008 of unclear cause. Examination revealed a 5'10" male, weight of 280 pounds,[9] reported fatigue, weight gain, dizziness, and lightheadedness, poor sleep, headaches, shortness of breath with wheezing, muscle weakness and gait disturbance, no anxiety, no blurry vision, and no memory impairment. Dr. Crisan diagnosed abnormal endocrine function study, impaired fasting glucose, impotence, and obesity (Tr. 344);

29.  An April 13, 2009 report from Dr. Crisan regarding a follow up appointment for evaluation of hypogonadism. Examination and testing revealed no changes from previous visit, an evaluation by Dr. Parther, a urologist, indicating a normal rectal exam and testicular ultrasound (Tr. 345);

30.  A May 22, 2009 report from Dr. Deol, Lynch's treating psychiatrist, indicating that Lynch was having difficulties adjusting to his disability and problems with his girlfriend. Lynch reported his mother lived across the street and his father was

---

[9] Lynch's weight when admitted to the hospital 11 months earlier was 234 pounds.

bedfast. Dr. Deol diagnosed central sleep apnea, increased the dosage of Wellbutrin[10] and referred Lynch to a therapist[11] (Tr. 371);

31. A July 26, 2009 report from Dr. Deol, indicating that Lynch complained of being irritable because he was not working and having no desire and no motivation at all. Dr. Deol noted that Lynch had unrealistic expectation from medications, was not adjusting to his disability, had financial problems, and was still having problems with balance. He did not recommend neuropsychological testing because Lynch's state medical card would not pay for it.[12] Dr. Deol continued the Wellbutrin and prescribed Paxil[13] (Tr. 372);

32. An October 2, 2009 report from Dr. Deol, indicating that Lynch complained of feelings of rage and being ready to explode and that everyone "pissed him off." He reported that Dr. Figel had

---

[10] Trade name for a monocyclic compound structurally similar to amphetamine, used as an antidepressant. Dorland's supra at 265.

[11] The record does not contain a report from a therapist, even though Lynch testified he saw a therapist named "Wendy."

[12] The record does not contain a referral by any health care provider, including Dr. Deol, for, or suggesting that Lynch have, neuropsychological testing.

[13] Trade name for a selective serotonin reuptake inhibitor ["SSRI"] used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders. Dorland's, supra at 1405.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

prescribed Remeron[14] that Lynch reported was not helping.  Dr. Deol

discontinued the Wellbutrin and Paxil and prescribed Depakote[15] (Tr.

373);

33.  A November 6, 2009 record from Dr. Deol, indicating that

Lynch reported that the Depakote was helping with his temper and

impulsivity and that he was also trying to walk.   Dr. Deol

increased his Depakote (Tr. 374); and

34.  A December 3, 2009 report from Dr. Crisan, indicating

that she had instructed Lynch about how to administer testosterone

injections.  Lynch had a diagnosis of hypogonadism, diabetes

controlled, without complicactions, abnormal thyroid function and

obesity (Tr. 349);

35.  A December 18, 2009 report from Dr. Deol, indicting that

Lynch reported he had a court hearing for disability. He also

reported that he was frustrated and afraid he was going to snap.

---

[14] Trade name for an antidepressant.  Used to treat depression
and major depressive disorder.  Dorland's supra at 1186.

[15] Trade name for a compound used in the treatment of manic
episodes associated with bipolar disorder.  Dorland's, supra at
565.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

His medications included Lyrica,[16] Coumadin, testosterone, Depakote, and Klonopin[17] (Tr. 375).

### VII. DISCUSSION

**A.   Plaintiff's Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consideration Even More Additional Medical Records, and Memorandum Itself (Dkt. No. 16)**

In his R&R, Magistrate Judge Kaull recommended that the Court deny Lynch's "Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" (dkt. no. 16).

On April 15, 2010, Lynch and his then counsel, Sharon Bogarad, received the ALJ's opinion, which notified them that they had 60 days to appeal the unfavorable decision to the Appeals Council. By letter dated May 4, 2010, signed by "Ms. Elo, a paralegal," Ms. Bogarad notified the Social Security Administration ("SSA") that Lynch wished to appeal the decision. The letter also stated that ". . . my office has not handled a Social Security matter beyond this point and I do not feel comfortable  starting with Mr. Lynch's

---

[16] Trade name for an anticonvulsant, antinociceptive, used in the treatment of neuropathic pain.  Dorland's, supra at 1531.

[17] Trade name for a benzodiazepine used as an anticonvulsant and as an antipanic agent in the treatment of panic disorders. Dorland's, supra at 379.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

case. I have informed him in person and in writing that I will not be representing him any further." (Dkt. No. 20 at 16). Importantly, this letter never requested an enlargement of time to file the appeal, nor did it note that any evidence was missing from the record, or request permission to submit further evidence. Id.

On May 13, 2010, Lynch's second attorney wrote to SSA requesting a review of the hearing decision. Id. at 17. He never noted that any evidence was missing from the administrative record, nor did he request additional time to review the decision and evidence or to submit additional evidence or argument to the Appeals Council. Id. On October 29, 2010, the Appeals Council denied Lynch's request for review, stating it found no reason to overturn the ALJ's decision. (Tr. 1).

On December 22, 2010, Cogan, Lynch's third and current counsel, timely filed this action seeking review of the final decision of the Commissioner. The Commissioner answered on February 14, 2011, and also filed the transcript of this case, certifying "that the documents annexed hereto constitute a full and accurate transcript of the entire record of proceedings relating to this case." (Dkt. No. 20 at 17). On March 20, 2011, Cogan filed a "Statement of Errors" (Dkt. No. 9) and, in a footnote, advised:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> Plaintiff's attorney did not handle this case at the
> hearing. He received a description of evidence of
> evidence [sic] ,e.g., physician examinations, that he
> cannot find in the record. Plaintiff's attorney has
> attached an appendix indicating evidence that previous
> counsel's office suggested was in the record but which
> current counsel cannot find.

Id. at 4 n.1.

Attached to Cogan's Statement of Errors was an "Appendix Regarding Missing Documents," which stated that Ms. Bogarad's office had advised that the missing medical evidence listed in the appendix "would have been submitted" to the SSA at Attachment No. 1. Cogan also noted in the Appendix that the records supplied by Ms. Bogarad's office "seem much fewer in number than those referenced in the brief yet previous counsel's office states that nothing was mentioned in its brief that was not submitted to Social Security." Id. at Appendix 1.

The magistrate judge noted that the Appendix attached to Lynch's Statement of Reasons included the following medical records:

1. An October 17, 2008 office note from Dr. Figel, indicating that Lynch complained that the "right side of body still feels funny and left side of head feels numb," and that he bad headaches, a lot of heartburn, and trouble hearing in his left ear.

Dr. Figel diagnosed CVA, disequilibrium, paresthesis, and depression. He listed Lynch's current medications as Elavil and Lyrica;

2. A November 21, 2008 office note from Dr. Figel, indicating that Lynch complained of being very depressed, that his lips went numb, that the left side of his face was still numb, and he had shooting pain in his left eye. Lynch reported that he had stopped taking all of his medications and had not had any lab work. Dr. Figel diagnosed CVA, disequilibrium, and depression and stated he would arrange an appointment with the Federal Clinic in Weirton;

3. A January 16, 2009, office note from Dr. Figel, indicating that Lynch reported his head "felt messed up today," that he felt pressure in his left ear, had been short of breath at times, and was having problems with erectile dysfunction. Dr. Figel diagnosed CVA, sinusitis, and ED. Dr. Figel prescribed Oxycodone;

4. A February 19, 2009 office note from Dr. Figel, indicating that Lynch complained of bloody noses and headaches that woke him up and felt like a sharp pain through his eyes. He reported the Oxycodone did not help at all and the Percocet took the edge off but did not last long. Dr. Figel diagnosed CVA,

headaches, depression, and sinusitis. He recommended an appointment with Dr. Deol and a second opinion from neurology;

5.    A March 10, 2009 office note from Dr. Figel, indicating that Lynch complained of continuing daily headaches, which Oxycodone, Percocet and Fioricet did not help. He reported seeing Dr. Deol, who stopped the Zoloft and prescribed Lexapro. Dr. Figel stated that Lynch was overall about the same, still depressed and anxious. Physical examination revealed a weight of 280 pounds, a blood pressure 122/81, pulse of 74, respirations 18, a supple neck with no lymphadenopathy, thyromegaly or bruit noted, a regular heart rate and rhythm, soft nontender abdomen, no clubbing, cyanosis or edema in his extremities, peripheral pulses of 2+ bilaterally, and noted that, neurologically, Lynch has some left sided residual weakness. Dr. Figel diagnosed Bilateral Cerebellar CVA, headaches, depression, and onychomycosis.  He recommended a lipid profile, SGPT, SGOT, GGT, chem 6, CBC, fasting blood sugar, thyroid function studies and continuation of follow up with Dr. Malik. He prescribed Ultram ER 100 mg tablets 1po qd and an appointment in one month;

6.    An April 28, 2009 office note from Dr. Figel, indicating that Lynch complained of "areas" on his right arm and toenail

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

fungus. Dr. Figel diagnosed Cerebellar CVA, Sleep Apnea, depression, onychomycosis, and hyperlipidemia. He noted that Lynch had a physical for Medicaid. He prescribed Duricef, Lamisil and SGPT, SGOT, 1 month; and

7. A June 9, 2009 office note from Dr. Figel, indicating that Lynch had a sleep study done which was remarkable for sleep apnea and is attempting to use a CPAP. He still complained of some intermittent headache and vague sensations on the right side at times. He has chronic dysequilibrium and is anxious and depressed. Dr. Figel diagnosed history of Cerebellar CVA, depression, sleep apnea, tinea pedis, and positive stressors. Dr. Figel stated that, even though more than one year had passed since the stroke, Lynch had not regained the capacity to work at his previous job and, in Dr. Figel's opinion, did not have the capacity for full-time employment.[18] Dr. Figel continued Lynch's medications and directed him to follow up in three months.

On April 28, 2011, the Commissioner filed his Motion for Summary Judgment, which argued that "[r]emand is not required to

---

[18] This is the document that was not in the certified record, that the ALJ specifically referenced when he stated that, even though Lynch testified "Dr. Figel told him in June that he could not go back to truck driving at that time," the is no evidence in the record to support his statement.

consider Plaintiff's Appendix, new evidence, or extra-record evidence." (Dkt. No. 10). The Commissioner contended that none of the evidence submitted by Lynch could provide a basis for remand pursuant to sentence six of § 405(g), unless the evidence was new, material, and there was good cause for the failure to incorporate it into the record at a prior hearing.

On May 5, 2011, Lynch filed his reply to the motion for summary judgment. (Dkt. No. 12). Also citing to 42 U.S.C. § 405(g), sentence six, he argued that the evidence submitted in the Appendix was new, material, not cumulative, and that good cause existed for its not having been submitted at the administrative level. <u>Id.</u> He contended that prior counsel "obviously thought that the material had been submitted" based on her reference to it in her pre-hearing brief, and obviously would not have prepared the brief had she not intended to submit it. <u>Id.</u> Lynch asserted that the "most likely possibility" was that the material had been properly submitted, but that the SSA had lost it and therefore failed to include it in the record. <u>Id.</u>

Lynch further contended that Ms. Elo's affidavit established her "distinct recollection" that she either submitted the evidence via fax prior to, or personally delivered it on, the date of the

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

hearing. Ms. Elo averred that she distinctly recalled drafting the pre-hearing memorandum and submitting it "via fax prior to the date of the hearing and/or personal submission on the date of the hearing." <u>Id.</u>

Nevertheless, the magistrate judge noted that the record contained none of this material. Nor were there any cover sheets reflecting that these faxes were confirmed as received. He therefore rejected Lynch's explanation, finding that it "was at least as likely that the materials were never submitted (due, possibly to failure of the faxes to go through), as it is the SSA simply "lost" the documents. <u>Id.</u> at 21.

A reviewing court may remand a Social Security case on the basis of newly discovered evidence if the following four prerequisites are met:

1)   The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." <u>Mitchell v. Schweiker</u>, 699 F.2d 185, 188 (4th Cir. 1983);

2)   It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. <u>King v. Califano</u>, 599 F.2d

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

597, 599 (4th Cir. 1979); Sims v. Harris, 631 F.2d 26, 28
(4th Cir. 1980);

3)      There must be good cause for the claimant's failure to
        submit the evidence when the claim was before the
        Secretary. 42 U.S.C. § 405(g); and

4)      The claimant must present to the remanding court "at
        least a general showing of the nature" of the new
        evidence. King, 599 F.2d at 599; Borders v. Heckler, 777
        F.2d 954 (4th Cir. 1985).

The magistrate judge determined that Lynch had only satisfied
three of these prerequisites, finding that the evidence 1) was
clearly relevant to the determination of disability at the time
Lynch filed his application, 2) was not cumulative of other
evidence in the record, and 3) was material because the ALJ
specifically based his negative decision in large part on the lack
of medical records and the fact that the record did not support
Lynch's testimony that his doctor had told him he could not work.
(Dkt. No. 20 at 21). He also acknowledged that, by submitting the
actual records to the court, Lynch had established the nature of
the new evidence.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Despite having satisfied three of the required prerequisites, according to the magistrate judge, Lynch failed to show good cause for not submitting the evidence when the claim was before the Commissioner. During the January 11, 2010 hearing, the ALJ specifically asked Lynch's prior counsel if she objected to the exhibits, at which time she stated that she did not. Moreover, at the end of the hearing, counsel requested an additional 45 days to obtain additional records from future doctor visits, but not for "missing" records. Id. at 21-22.

Based on all this, the magistrate judge observed that anyone with knowledge of the evidence in the case should have recognized that relevant medical records were missing. Significantly, while Lynch blames the ALJ for not realizing that the record from Dr. Figel's June 2009 examination was missing, he never acknowledges his own counsel's failure to notice that the ALJ's decision expressly stated that the evidence of record did not contain this document. Id. at 22.

As noted, Lynch's former counsel, had 60 days from the date the ALJ entered his decision to advise either the ALJ or the Appeals Council that evidence was missing from the record, but failed to do so. Thus, as Magistrate Judge Kaull noted in his R&R,

the Appeals Council found no reason to reverse the ALJ's decision. Id. Based on all this, the Court concludes that Lynch failed to show good cause for not submitting the additional evidence at the administrative level, and therefore denies his "Motion to Remand Because of New and Material Evidence."

**B.   Claimant's Second Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself"(Dkt No. 18)**

On September 8, 2011, Lynch filed "Claimant's Second Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" (dkt no. 18), and attached records from a visit to Dr. Malik, a neurologist, dated November 2009, just two months before the Administrative Hearing, which his counsel had obtained in relation to a subsequent claim being pursued by Lynch. Lynch argues that this "suggest[s] that Drs. Deol and Malik did not respond to any request from previous counsel that they send complete records." Id.

In his R&R, Magistrate Judge Kaull determined that the basis for this argument was speculative, and noted that, even if the argument did not constitute mere speculation, he would not remand the case to the ALJ based on evidence that existed in 2009, but was

32

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

never submitted until eight months after this Court had begun its consideration of the Complaint. The Court agrees, and therefore denies the Claimant's Second Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself. (Dkt. No. 18).

## C.    **Motions for Summary Judgment**

Both the Commissioner and Lynch objected to the magistrate judge's recommendations that the Commissioner's motion for summary judgment be denied and the plaintiff's motion for summary judgment be granted-in-part, and the case remanded for further proceedings. (Dkt. No. 20 at 35-36). The Court turns now to those objections.

## 1.    Plaintiff's Obesity

In his R&R, the magistrate judge determined that the ALJ's reliance on the State agency reviewer's opinion was not well founded because that opinion failed to address Lynch's medically-diagnosed obesity. After careful review, the magistrate judge found that the medical records in this case contain a diagnosis of obesity by a treating physician and that there is no evidence to the contrary.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

SSR 02-1p provides guidance on SSA policy concerning the evaluation of obesity in disability claims filed under Titles II and XVI. SSR 02-1p, 2002 WL 3468628 at *1.

SSA policy states that, in the absence of evidence to the contrary in the record, it will accept a diagnosis of obesity from a treating source or a consultative examiner.  SSR 02-1p at *3.

SSR 02-1p further provides:

> As with any other medical condition, we will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual' physical or mental ability to do basic work activities.  We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning . . . . Therefore we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities . . . .

SSR 02-1p at *4.

The ALJ also must consider obesity at the third step of the sequential evaluation when determining whether any impairment(s), alone or in combination, meets a listing, and at steps four and five, when assessing functioning. SSR 02-1p at *3.

Lynch is 5'10". At the time of his stroke, he weighed 234 pounds. The State agency physician opinion submitted about five months after Lynch's stroke does not include obesity even as a

secondary or "other" diagnosis. The record, however, documents that, on March 24, 2009, 11 months after his stroke, Viorica M. Crisan, M.D., an endocrinologist, examined Lynch and noted that he was 5'10" and weighed 280 pounds. She diagnosed abnormal endocrine function, impaired fasting glucose, impotence, and obesity. (Tr. 344).

The ALJ did not consider obesity when determining Lynch's medically determinable or severe impairments, or his RFC. At the time the State agency physician completed her PRFC on September 22, 2008, she was unaware of the diagnosis of obesity, which never appeared in the record until Dr. Crisan's report of March 24, 2009. Thus, she did not consider, indeed she could not have considered, the effects of Lynch's obesity in her assessment. Nor could the ALJ, who relied on her RFC, have considered obesity in his determination of Lynch's impairments or RFC. Therefore, the magistrate judge correctly concluded that the case should be remanded for further evaluation.

2.    Plaintiff's Mental Impairments

As to Lynch's mental impairments, the magistrate judge concluded that the record does not substantially support 1) the ALJ's reliance on the State agency psychologists' opinions, which

were provided long before most of the evidence regarding Lynch's mental impairments even existed, and 2) the ALJ's determination that Lynch's only mental impairment was anxiety, or, alternatively, that he had no severe mental impairment. (Dkt. No. 20 at 33).

Although Lynch alleged disability due to anxiety and depression, the ALJ found that, prior to his stroke, Lynch had only received limited mental health treatment and had no history of anxiety and depression. He also noted, however, that, shortly after Lynch's stroke, his primary care physician had prescribed Xanax for anxiety and nervousness, and had increased the dosage a month later.

The ALJ nevertheless concluded that the evidence of record did not "establish the presence of a severe psychological impairment for any continuous 12 month period," and that "[c]onsistent with the assessments submitted by the state agency psychological consultants, the claimant's anxiety had been evaluated under Section 12.06 of Appendix 1, dealing with anxiety-related disorders." (Tr. 16). He further determined that Lynch had only mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining

concentration, persistence and pace and had had no episodes of decompensation. Id.

The problem with this determination is that the State agency psychologists on whose PRTF assessment the ALJ placed significant weight possessed only limited records from April 2008, when Lynch suffered his stroke, through September 23, 2008. Although the medical evidence in the record includes reports about mental health treatment beginning on May 22, 2009, when Lynch first began seeing a psychiatrist, the State agency reviewing psychologists did not have the benefit of those mental health records when conducting their review.

Lynch's application, which he filed in July 2008, reported that he was taking an anxiety medication and Sertraline, the generic form of Zoloft, a medication for depression. Also, in his request for hearing in December 2008, Lynch alleged that he had new mental limitations consisting of depression and anxiety.

After reviewing the medical records, the magistrate judge concluded that the ALJ could not have reasonably relied on the State agency psychologists' opinions because of evidence in the record that Lynch's treating physician, Dr. Figel, had prescribed Xanax in June 2008, and Zoloft in July 2008. Additionally, the

medical records also evidence Dr. Crisan's diagnosis of depression and prescription of anti-depressant medications in March, April, and June 2009, and that she started Lynch on Depakote in October 2009.

The magistrate judge also noted that the evidence of record includes reports of Lynch's treatment with Dr. Deol, a psychiatrist, beginning in May 2009, which note that Lynch was already on Wellbutrin. Dr. Deol increased that dosage and referred Lynch to a therapist, identified as "Wendy." Dr. Deol also noted that Lynch was having trouble "adjusting to disability."

In July 2009, Dr. Deol increased Lynch's dosage of Wellbutrin and added Paxil, another antidepressant. Indeed, Dr. Deol commented that Lynch had an "unrealistic expectation from meds." In October 2009, Dr. Deol noted that "the Remeron," yet another antidepressant, prescribed by Lynch's treating physician, Dr. Figel, was not working. He also discontinued Wellbutrin and Paxil, and prescribed Depakote.

In November 2009, Lynch reported that the Depakote was helping with his temper and impulsivity, at which time Dr. Deol increased the dosage. Then, in December 2009, only weeks before the hearing, Lynch told Dr. Deol he was afraid he was going to "snap." As a

result, Dr. Deol continued his Depakote and added Klonopin, yet another antidepressant.

After a de novo review of the evidence of record, the Court agrees with the magistrate judge's recommendation to remand this case because the evidence does not substantially support the ALJ's conclusion that Lynch's only mental impairment was anxiety, or that he had no severe mental impairment.


**3.  Credibility**

The ALJ determined that Lynch's "medically determinable impairments" could reasonably be expected to cause some of his alleged symptoms, but concluded that Lynch's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible, and were inconsistent with his residual functional capacity assessment. The ALJ listed Lynch's medically determinable impairments as post bilateral cerebellar cerebrovascular accident with sensation, gait and balance residuals, sleep apnea, diabetes, enlarged heart, and anxiety.

As noted earlier, the ALJ failed to consider obesity and depression as at least medically-determinable impairments. Thus, because SSR 02-1p provides that obesity may also cause or

contribute to other physical or mental impairments, such as depression, the magistrate judge determined that the ALJ had failed to consider "all the available evidence," and that the record did not contain substantial evidence to support a finding that Lynch was not entirely credible. <u>Id.</u> at 35. The Court agrees.

## VIII. <u>CONCLUSION</u>

After due consideration of both the Commissioner's and Lynch's objections, it appears that neither has raised any issues that were not thoroughly considered by Magistrate Judge Kaull in his R&R. Moreover, upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances in this action. Therefore, it **ADOPTS** Magistrate Judge Kaull's R&R in its entirety (dkt. no. 20) and

1.  **DENIES** the Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even More Additional Medical Records, and Memorandum Itself" (dkt. no. 16);

2.  **DENIES** the Second Motion to Permit Further Memorandum in Support of Motion to Reverse and Remand to Consider Even

---

More Additional Medical Records, and Memorandum Itself"
(dkt. no. 18);

3.     **DENIES** the Commissioner's Motion for Summary Judgment
(dkt. no. 10);

4.     **GRANTS-IN-PART** plaintiff's motion for Summary Judgment
(dkt. no. 9);

5.     **REMANDS** this case for consideration pursuant to the
recommendations contained in the magistrate judge's
Report and Recommendation; and

6.     **DISMISSES** this case **WITH PREJUDICE** and **DIRECTS** the Clerk
to strike it from the docket of this Court.

It is to **ORDERED.**

Pursuant to Fed. R. Civ. P. 58, the Court directs the Clerk of
Court to enter a separate judgment order and to transmit copies of
this Order to counsel of record.

DATED: March 30, 2012.


                                   /s/ Irene M. Keeley
                                   IRENE M. KEELEY
                                   UNITED STATES DISTRICT JUDGE